**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| ONEBEACON INSURANCE COMPANY, et.al., <br><br> Plaintiffs <br><br> v. <br><br> METRO READY-MIX, INC., <br><br> Defendant | CASE NO:  05-1530 |

### PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Plaintiffs OneBeacon Insurance Company (hereinafter "OneBeacon") and Pennsylvania General Insurance Company (hereinafter "Pennsylvania General"), by their undersigned counsel, Stacey A. Moffet, Larry L. Puckett and Eccleston and Wolf, P.C., submit this Reply to Defendant's Opposition to Plaintiffs' Motion for Summary Judgment.

### UNDISPUTED FACTS

The instant action arose because there is an actual controversy that exists between the parties as to the nature, scope and extent of insurance coverage provided under a commercial general liability (CGL) policy (hereinafter "the Policy") for a claim that was submitted by Metro. The facts giving rise to the claim are undisputed.

Metro had a contract with Berkel to supply concrete with specific strength requirements for Berkel's various construction projects. Affidavit of Sachinder N. Gupta, ¶¶ 4,7, attached to Metro's Opposition as Exhibit 1.  However, Metro has admitted that it provided defective product to Berkel.  *See* Amended Complaint ¶ 61; Exhibit C; Metro's Opposition, p. 26. As a result of the defective product supplied by Metro, pilings in which Metro's product had been

used had to be demolished and reconstructed at a significant cost to Berkel.  *See* Amended Complaint ¶ 10. When Berkel refused to pay Metro's invoices for the product that Metro supplied to Berkel, Metro filed a collection action against Berkel for payment of the outstanding invoices. *See* Amended Complaint ¶ 9.

In response to this collection action, Berkel filed a Counterclaim against Metro seeking damages in the amount of $285,040.25 that it incurred as a result of the defective product supplied by Metro. *See* copy of Counterclaim (Exhibit B to Amended Complaint). From a review of the Counterclaim, it is clear that the damages consisted solely of costs that were incurred as the direct result of the defective product and/or work supplied by Metro, including the replacement of Metro's product and the reconstruction of pilings in which Metro's product was used. *See* Amended Complaint ¶ 11; *see also* copy of Counterclaim ¶¶ 7-8 (Exhibit B to Amended Complaint). Furthermore, there are no allegations in the Counterclaim that any property of any third party was physically injured as a result of Metro's defective product or work.

As a result, for the reasons set forth more fully below, OneBeacon and Pennsylvania General filed the instant action seeking a declaration that they were not obligated to defend Metro and that they have no obligation to indemnify Metro in connection with and for any damages claimed in the Counterclaim.  Subsequent to filing the instant action, OneBeacon and Pennsylvania General discovered that Metro had entered into a Settlement Agreement and General Release (hereinafter "Settlement Agreement") with Berkel, whereby Metro agreed to issue a "credit memorandum in the full amount of all of Metro's invoices to Berkel that are unpaid as of the date of this settlement," which thereby resulted in no payment being made by Metro to Berkel to resolve the claim. *See* Amended Complaint ¶ 60; Exhibit C. In light of the

Settlement Agreement, OneBeacon and Pennsylvania General filed an Amended Complaint to add a Count seeking a declaration that they were not obligated to defend Metro and have no obligation to indemnify Metro for the claim since Metro is not "legally obligated to pay any damages."

While the Settlement Agreement whereby Metro was not required to pay any sums to Berkel should have resolved the claim, Metro nevertheless contends that it is entitled to recover payment from OneBeacon and Pennsylvania General for the invoices that Berkel would not pay as a result of Metro's defective product. Thus, Metro is attempting to convert OneBeacon and Pennsylvania General into collection agencies to recover sums under a CGL policy that would otherwise be uncollectible. However, as set forth below, CGL policies are not performance bonds and are not designed to collect invoices for defective product.

In addition, Metro alleges that OneBeacon and Pennsylvania General should be estopped from not only denying coverage, but that the Court should use estoppel to extend coverage, because Metro was under the mistaken belief that the Policy would provide coverage for the instant claim as a result of the fact that a prior claim was paid. Metro's Opposition, p. 7-8. Therefore, Metro is claiming that because a prior claim was paid, OneBeacon and Pennsylvania General should be unable to assert any defenses whatsoever with respect to any others claims that Metro submits.  However, as set forth more fully below, Metro's contentions with respect to estoppel are contrary to Maryland law.

## **LEGAL ARGUMENT**

I.  **OneBeacon And Pennsylvania General Are Not Estopped From Asserting Lack Of Coverage And Estoppel Cannot Create Coverage Under Maryland Law**.

As set forth in Windt, Insurance Claims and Disputes, Representation of Insurance Companies and Insureds, § 6:33, p. 782 (4th Ed. 2001), contentions with respect to estoppel

similar to those argued by Metro herein were considered and rejected in the decision captioned Hartford Accident & Indemnity Co. v. Regent Nursing Home, 413 N.Y.S.2d 195 (1979). In Hartford, the insured was sued for malpractice, which was subject to a policy exclusion, but the insured claimed that it was entitled to coverage on the grounds of estoppel because the carrier had settled a prior action involving an almost identical claim. *Id.* at 936. Likewise, similar to the contentions by Metro herein, due to the fact that the prior claim was paid, the insured did not purchase separate malpractice coverage. *Id.*

The Court in Hartford rejected the insured's estoppel claim on the grounds that the reliance by the insured was not justifiable and in particular held that:

> [a]lthough Regent's partners may have expected that Hartford would provide full insurance coverage with respect to any accident similar to the accident in the Freeman case [the case that had been settled], such an expectation does not give rise to an estoppel under the circumstances at bar. From the settlement of an unadjudicated claim of negligence, which entailed at best an indeterminate element of malpractice, it can hardly be reasonably inferred that Hartford would in the future indemnify Regent in similar situations for all adjudicated damages to the limits of its policy, without regard for the exclusion of coverage for bodily injury due to malpractice . . . If such was the nature of Regent's reliance, then we find it, as a matter of law, to be misplaced.

*Id.* at 937; *see also* Lido Co. v. Fireman's Fund Ins. Co., 574 A.2d 299, 301 (Maine 1990)(no estoppel simply because insurer had previously provided coverage for a similar claim); Jacore Sys. V. Central Mut. Ins. Co., 194 Ga. App. 512 (1990)(no estoppel even though insurer had previously paid a similar claim); FDIC v. Duffy, 47 F.3d 146,150 (5th Cir. La. 1995)(Louisiana law)("Conduct in paying one claim under a policy does not prevent the insurer from raising defenses").  Similarly, with respect to the instant claim, simply because a prior claim was paid, that does not prevent OneBeacon and Pennsylvania General from denying coverage on the instant claim or from asserting exclusions under the Policy.

In addition, as noted by Windt, <u>Insurance Claims and Disputes, Representation of Insurance Companies and Insureds</u>, § 6:33, p. 783 (4th Ed. 2001), the Court in <u>Hartford</u> "could have reached the same conclusion simply by recognizing that the insured is deemed to have constructive knowledge of the contents of his or her policy." Due to the fact that the insured in <u>Hartford</u> was deemed to have constructive knowledge of the contents of the policy and was never told that future malpractice claims would be paid, the insured had no basis for assuming that the insurer would continue to make payments not required by the policy. *Id.* Likewise, in the instant action, Metro was never told by OneBeacon or Pennsylvania General that future claims would be paid. Metro only assumed that fact. Since Metro is deemed to have constructive knowledge of the contents of the Policy, absent such affirmative assurances of payment of future claims, Metro's reliance could not have been justified. *Id.*

Furthermore, under the "Insuring Agreement" of the Policy, OneBeacon and Pennsylvania General may, at their discretion, "investigate any 'occurrence' and settle any claim or 'suit' that may result." Exhibit A to Amended Complaint (the Policy), Section I.1.a. Consequently, a decision by OneBeacon and Pennsylvania to pay a claim is not necessarily dependent on a determination that there was in fact an "occurrence" or "property damage," but simply a discretionary business decision that could have been for any number of valid reasons.

In addition, the decision captioned <u>Nationwide Mutual Insurance Company v. Regional Electric Contractor</u>s, 111 Md. App. 80 (1996), that is primarily relied upon by Metro with respect to its estoppel argument, does not even support Metro's assertions with respect to detrimental reliance. In <u>Nationwide</u>, a switchboard exploded when one of Regional's employees inspected wiring leading to the switchboard and a reheat unit in another room. *Id.* at 83-84. On the day of the incident, Regional's Vice President contacted a Nationwide agent and was told that

Nationwide "would take care of it" and "that's why you have insurance." *Id.* at 84.  In reliance on those statements, Regional made the repairs and sent an invoice to Nationwide for reimbursement. *Id.* However, Nationwide denied the claim on the grounds that it was subject to policy exclusions. *Id.* Based on the facts of that case, the Court held that Nationwide's agent induced Regional to repair the damaged switchboard and that Nationwide was estopped from denying coverage. *Id.* at 94.

However, critical in the Court's analysis in <u>Nationwide</u>, with respect to the statements made by Nationwide's agent, was the rule of law that in order to bind the principal, the agent's statement must be made "contemporaneously with the transaction to which it relates," i.e. <u>Nationwide</u> dealt with representations that were made with respect to the very claim on which the insured claimed reliance.  *Id.* at 92.  In <u>Nationwide</u>, the claim submitted by Regional was the cost that Regional incurred in making repairs that were only made because Regional believed that, based on the statements by Nationwide's agent, Regional would be reimbursed from Nationwide. *Id.* at 93-94. In light of these specific facts in the <u>Nationwide</u> case, the Court found that Regional was induced to make the repairs, and therefore incur costs, solely because of the statements that were contemporaneously made by Nationwide's agent. *Id.*  Consequently, the Court found that Regional would not have made the repairs and therefore would not have incurred the costs that it was claiming if Nationwide's agent had not made the statements in question. In other words, the Court found a "prejudicial change" in Regional's conduct directly and solely related to the actions of Nationwide's agent with respect to that <u>very</u> claim.

However, the instant case is completely different from the <u>Nationwide</u> case because Metro did not rely on any conduct by OneBeacon or Pennsylvania General that occurred with respect to the <u>instant</u> claim. Metro's contentions relate solely to the payment of a <u>prior</u> claim,

which was not addressed by the Court in <u>Nationwide</u>.  Unlike the situation in <u>Nationwide</u>, Metro does not contend that any representative of OneBeacon or Pennsylvania General advised it that when the prior claim was paid, that all future claims would also be paid or that the policy (and any renewal policies) would now cover the insured's defective work.  Contrary to Metro's contentions, CGL policies are not performance bonds nor do they serve as a warranty of goods and services. <u>Lerner Corp. v. Assurance Co. of Am</u>., 120 Md. App. 525, 537 (1998).  Metro is deemed to have understood and appreciated the limited scope of coverage afforded by a CGL policy and its assumptions that this scope was extended because an unrelated, different, prior claim was paid was unwarranted and unreasonable.  Consequently, the <u>Nationwide</u> decision is completely distinguishable from the instant action and it is abundantly clear that the Plaintiffs are not estopped from denying coverage or asserting exclusions contained in the Policy.

Furthermore, it is clear that <u>Nationwide Mutual Insurance Company v. Regional Electric Contractor</u>s, 111 Md. App. 80 (1996), is not a proper recitation of Maryland law on the issue of whether estoppel can be applied to extend coverage where none would otherwise exist. To the contrary, the law is well settled in Maryland that "estoppel may occur only when it does not create new coverage; an extension of coverage may only be created by a new contract." <u>Sallie v. Tax Sale Investors</u>, 149 Md. App. 141, 147 (2002)(quoting <u>Allstate Insurance Company v. Reliance Insurance Company</u>, 141 Md. App. 506,515 (2001)); *see also* <u>United Capitol Insurance Company v. Kapiloff</u>, 155 F.3d 488,497 (4th Cir. 1998).

Therefore, since these decisions were issued subsequent to the <u>Nationwide</u> decision, to the extent that the <u>Nationwide</u> decision was once the law in Maryland, that is no longer the case. Consequently, Metro's contention in its Opposition that "under Maryland law, equitable estoppel would apply even if the terms of the Policy did not actually provide coverage or excluded

coverage in the first instance" is clearly an incorrect statement of Maryland law. *See* Metro's Opposition, p. 8.   To the contrary, as set forth above, under Maryland law, estoppel cannot extend coverage where none otherwise exists, which is precisely what Metro is attempting to argue.   Consequently, Plaintiffs are not estopped from denying coverage or asserting the exclusions contained in the Policy.

II.     **OneBeacon And Pennsylvania General Were Not Obligated To Defend Metro And Have No Obligation To Indemnify Metro For The Claims Asserted In The Underlying Counterclaim As There Has Been No "Occurrence" Or "Property Damage" As Defined In The Policy**.

As set forth more fully in the Plaintiffs' Memorandum of Law in support of their Motion for Summary Judgment, the insurance at issue in this case only applies if "property damage" is caused by an "occurrence." Amended Complaint, Exhibit A (the Policy), Sections I.1.a. and I.1.b.   Under Maryland law, there has been an "occurrence" under a CGL policy only upon the happening of an "accident," which is defined as when "a negligent act causes damage that is unforeseen or unexpected by the insured." Lerner Corp. v. Assurance Co. of Am., 120 Md. App. 525, 535 (1998).   However, unlike Defendant's characterizations, not all accidental happenings are covered by a CGL policy.

In cases involving damages related to construction projects, this Court has held that "the critical inquiry in determining whether alleged damages were "expected" by the insured is whether the damages relate to the satisfaction of the insured's contractual obligations to construct its product or whether the damages relate to something other than the insured's product." Mutual Benefit Group v. Wise M. Bolt Company, Inc., et al., 227 F.Supp.2d 469,475-76 (D. Md. 2002). If the damages relate to the satisfaction of the insured's contract, there has been no "occurrence" and thus, no coverage under a CGL policy. *Id.* at 476 (citing Lerner Corp. v. Assurance Co. of Am., 120 Md. App. 525, 535 (1998)). Stated another way, a "CGL policy

does not serve as a performance bond, nor does it serve as a warranty of goods and services."
Lerner, 120 Md. App. at 537.

However, a performance bond is precisely what Metro is attempting to convert the instant
CGL policy into. Under its contract with Berkel, Metro had an exclusive contract to supply
concrete, with specific strength requirements, for Berkel's various construction projects.
Affidavit of Sachinder N. Gupta, ¶¶ 4,7, attached to Metro's Opposition as Exhibit 1. Metro
admits that "its newly hired plant operator inadvertently mixed the wrong ratio of water to
cement (utilizing excessive water in the mix)" and that as a result, "the grout manufactured by
Metro was defective." Affidavit of Sachinder N. Gupta, ¶ 5 ((Exhibit 1 to Metro's Opposition).
In addition, Metro then admits that as a result of the low strength grout, pile caps and columns,
"which had been constructed upon the piles" in which Metro's product was used, had to be
demolished and reconstructed.   Affidavit of Sachinder N. Gupta, ¶ 7 (Exhibit 1 to Metro's
Opposition)(Emphasis supplied).

From these facts, it is abundantly obvious that the damages in question "relate to the
satisfaction of the insured's contract" and that as result, "there has been no "occurrence" and thus,
no coverage under a CGL policy." Mutual Benefit Group v. Wise M. Bolt Company, Inc., et al.,
227 F.Supp.2d 469,476 (D. Md. 2002)(citing Lerner Corp. v. Assurance Co. of Am., 120 Md.
App. 525, 535 (1998)). As stated by the Court in Lerner, "it should not be unexpected and
unforeseen that, if the Building delivered does not meet the contract requirements of the sale, the
purchaser will be entitled to correction of the defect." (Emphasis supplied). Thus, by supplying
defective product, which Metro knew would be used to construct pilings for a parking garage, it
was certainly not unexpected or unforeseen that pile caps and columns which had been
constructed upon the pilings in which Metro's product was used, would have to be demolished

and reconstructed.   That is merely the cost associated with the <u>correction of the defect</u> that Berkel would have been entitled to as a result of the failure of Metro to comply with its contractual obligations. Consequently, there has been no "occurrence" under the Policy.

In addition, the facts of the instant action are supported by the illustration contained in the Court's decision in <u>Lerner Corp. v. Assurance Co. of Am</u>., 120 Md. App. 525, 537 (1998), relied on by Metro, in which the Court stated that "if a collapse of the veneer had injured a user of the facility or damaged property other than the veneer itself, these may well be covered."  While the removal of the veneer would clearly be necessary if one were to fulfill their contractual obligations and construct a new veneer, the removal of the veneer itself would not constitute "property damage." As applied to the instant action, the replacement of the pilings to construct new pilings, as was required for Metro to fulfill its contractual obligations, was not "property damage," and there is no contention that the pilings collapsed and caused specific injury or property damage to the work or product of other contractors. Therefore, there has not been an "occurrence" under the Policy.

Similarly, Metro's citation to <u>Harbor Court Associates v. Kiewit Construction Co</u>., 6 F.Supp.2d 449 (D. Md. 1988), on the issue of "property damage" is likewise without merit. In <u>Harbor Court Associates</u>, the Court noted that "negligent performance in furnishing and erecting the structural steel and metal floor deck work is claimed to have damaged the masonry work performed by [the masonry subcontractor], leading to the defects in the brick veneer" and, thus, was not covered by the CGL policy at issue. *Id.* at 457. However, in comparison with the instant action, for the same reasons set forth above, the replacement of the pilings to construct new pilings was not "property damage," and there is no contention that the pilings collapsed and

caused specific injury or property damage to the work or product of other contractors. Therefore, there has not been an "occurrence" under the Policy.

In addition, Metro's reliance on <u>DeWitt Construction Inc. v. Charter Oak Fire Insurance Company</u>, 307 F.3d 1127 (9th Cir. 2002) in its Opposition is misplaced because the <u>DeWitt</u> case applied Washington law and not Maryland law. This is significant because under Washington law, the unintentional mismanufacture of a product constitutes an "occurrence" under a CGL policy. *Id.* at 1133.  On the contrary, under Maryland law as set forth above, if the claimed damages relate to the failure to perform a contract, such as the mismanufacturing of a product pursuant to specific contract requirements, there has been no "occurrence" and thus, no coverage under a CGL policy. <u>Mutual Benefit Group v. Wise M. Bolt Company, Inc., et al</u>., 227 F.Supp.2d 469,476 (D. Md. 2002)(citing <u>Lerner Corp. v. Assurance Co. of Am</u>., 120 Md. App. 525, 535 (1998)). Therefore, the application of the <u>DeWitt</u> case to this action is clearly inappropriate.

For the reasons set forth above, the damages that were claimed by Berkel in the Counterclaim that gave rise to this claim were not the result of an "accident," but were merely economic damages resulting from Metro's failure to satisfy its contractual obligations as demonstrated not only by the "damages" claimed by Berkel's Counterclaim. As there has been no "occurrence" under the insuring agreement of the Policy, no coverage exists.

Furthermore, under the provisions of the Policy, in the event that the Court determines that there has been an "occurrence, "the insurance only applies if there has been "property damage" caused by the "occurrence." Amended Complaint, Exhibit A (the Policy), Sections I.1.a. and I.1.b. With respect to "property damage," it is important to note that there is no evidence demonstrating that any property of any third party was physically injured as a result of

Metro's defective product or work or that there was loss of use of property. This is critical because "Property damage" is defined in the Policy as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Exhibit A (the Policy), Section V.17.

The Affidavit of Metro's President, Sachinder N. Gupta, that is attached to Metro's Opposition as Exhibit 1, clearly demonstrates that no property of any third party was physically injured as a result of Metro's defective product or work. In his Affidavit, Mr. Gupta states that as a result of the low strength grout that was supplied by Metro, pile caps and columns "which had been constructed <u>upon the piles</u>," had to be demolished and reconstructed. Affidavit of Sachinder N. Gupta, ¶ 7 (Exhibit 1 to Metro's Opposition)(Emphasis supplied). As to these pile caps and columns that had been constructed upon the pilings that contained Metro's product, there has clearly been no property damage caused by Metro's product. These pile caps and columns only had to demolished because they were situated on top of pilings, incorporating Metro's defective product, that were not strong enough to support them.

Furthermore, even as to the pilings themselves that contained Metro's product, these pilings were demolished solely as the result of the fact that they incorporated Metro's defective product.  That is not "property damage" under the Policy but merely an expected and foreseeable consequence of Metro's supplying defective product or work. Consequently, as there has been no "property damage" as defined in the Policy, there is no coverage under the Policy.

The analysis by the Maryland Court of Appeals in <u>Woodfin Equities Corp. v. Harford Mut. Ins. Co</u>., 110 Md. App. 616 (1996), is illustrative to demonstrate that there was no property

damage.[1]  In <u>Woodfin</u>, where the insured's defective HVAC unit was incorporated into the building, the Court held that "[v]oluntarily pulling up carpeting or breaking through dry-wall to access the HVAC units is not property damage; it is the cost incurred in replacing and repairing the HVAC systems." *Id*. at 649 n.8.  Thus, in the instant action, while the pilings, pile caps and columns were demolished as a result of the incorporation of Metro's deficient product into the pilings, there was no property damage. The demolition of the pilings, pile caps and columns was the cost incurred in replacing and repairing Metro's product and/or work. Consequently, there was no "property damage" and thus no coverage under the Policy.

As a result, OneBeacon and Pennsylvania General were not obligated to defend Metro and have no obligation to indemnify Metro for the claims asserted in the underlying Counterclaim. Therefore, OneBeacon and Pennsylvania General respectfully request that the Court grant summary judgment in their favor and against the Defendant.

III.     **<u>OneBeacon And Pennsylvania General Were Not Obligated To Defend Metro And Have No Obligation To Indemnify Metro For The Claims Asserted In The Underlying Counterclaim As Such Damages Are Excluded Under The Business Risks And Contractual Liability Exclusions Contained In The Policy.</u>**

As set forth above in Section II, since there has been no "occurrence," OneBeacon and Pennsylvania General were not obligated to defend Metro and have no obligation to indemnify Metro for the claims asserted in the underlying Counterclaim. However, in the event that a determination is made that there has been an "occurrence" as defined in the Policy, the allegations contained in the Counterclaim nevertheless fall within one or more business risks and contractual liability exclusions contained in the Policy.

---

[1] In its Opposition, Metro contends that this Court should not consider the analysis conducted in <u>Woodfin</u> because it was overruled on other grounds and therefore, as Metro contends, merely *dicta*. However, in <u>Lerner</u>, <u>supra</u>, 120 Md. App. at 533-34, the Court held that "we do not believe that the Court of Appeals necessarily rejected our coverage analysis in *Woodfin*" and "still find . . . *Woodfin* instructive on the interpretation of CGL policies generally."

A.  **Exclusion k "Damage To Your Product"**:

As set forth in the Plaintiffs' Memorandum of Law in support of their Motion for Summary Judgment, under Exclusion k, the Policy excludes coverage for "'property damage' to 'your product' arising out of it or any part of it." Amended Complaint, Exhibit A (the Policy). The defective grout supplied by Metro clearly satisfies the definition of "your product" under the Policy since the grout was manufactured, sold, handled, distributed and/or disposed of by Metro. Thus, with respect to the damages requested in the Counterclaim, for the damages sought against Metro that consist of replacing the grout supplied by Metro, there is no coverage under Exclusion k of the Policy, as such costs would be the result of property damage to Metro's product. *See, e.g.,* Century I Joint Venture v. United States Fidelity & Guar. Co., 63 Md. App. at 555 (applying the "your product" exclusion to deny coverage).

Metro does not appear to dispute this fact and instead claims that it is not seeking damages related to the replacing the grout supplied by Metro. *See* Metro's Opposition, p. 19. However, it cannot be disputed that the Counterclaim requested damages based upon the replacement of Metro's product since the damages consisted of, *inter alia*, costs associated with the installation of "additional pilings constructed of the proper strength grout." Counterclaim (Exhibit B to Amended Complaint).

In addition, due to the settlement agreement entered into by Metro, the implications of which are discussed below in Section IV, *infra*, Metro agreed to issue a "credit memorandum in the full amount of all of Metro's invoices to Berkel that are unpaid as of the date of this settlement" and the parties agreed to dismiss all claims with prejudice. *See* Amended Complaint ¶ 60; *see also* Settlement Agreement and General Release, attached to the Amended Complaint as Exhibit C.  Metro is now seeking payment from the Plaintiffs herein for that same amount.

That is, Metro demanded payment of $241,254.00 for its work; Berkel refused payment on the grounds that Metro's work was defective; recognizing its work was defective, Metro settled the claim and issued a credit for $241,254.00; Metro now claims that very amount as "damages" under its CGL policy. Consequently, contrary to Metro's contentions, Metro is in fact making a claim for damages relating to the supply of its product.

Therefore, with respect to the damages sought against Metro that consist of replacing the grout supplied by Metro, there is no coverage under Exclusion k of the Policy. As a result, OneBeacon and Pennsylvania General were not obligated to defend Metro and have no obligation to indemnify Metro for the claims asserted in the underlying Counterclaim. Therefore, OneBeacon and Pennsylvania General respectfully request that the Court grant summary judgment in their favor and against the Defendant.

B.    **Exclusion m "Damage To Impaired Property Or Property Not Physically Injured"**:

As set forth in the Plaintiffs' Memorandum of Law in support of their Motion for Summary Judgment, under Exclusion m, the Policy excludes coverage for "property damage" to "impaired property," arising out of "a defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work.'" With respect to the instant claim, the pilings in which the grout supplied by Metro had been used were impaired and had to be removed and reconstructed. *See* Counterclaim (Amended Complaint, Exhibit B), ¶¶ 6-8. Consequently, under Exclusion m, the damages in the Counterclaim that were incurred as a result of the necessity to remove and reconstruct the impaired pilings are excluded from coverage under the Policy, as Metro's product or work was deficient, inadequate and/or the damages are the result of a failure by Metro to perform the contract in accordance with its terms.

A review of Metro's Opposition reveals two inconsistent positions relevant to Exclusion M. On page 20 of its Opposition, Metro claims that "this exclusion has no applicability in the instant case as the facts are clear that the damaged property could not be 'restored to use' by Metro repairing its defective product (the grout) or by Metro providing new grout." However, on page 19 of its Opposition, Metro claims that "the demolition of the pile caps and columns was not necessary to replace or repair Metro's product (the grout)." If it is true, as Metro alleges, that it was not necessary to demolish the pile caps and columns to repair or replace Metro's product, then the pile caps and columns could be restored to use by the repair or replacement of Metro's product.

Consequently, under Exclusion m, the damages in the Counterclaim that were incurred as a result of the removal and reconstruction of impaired property are excluded from coverage under the Policy. As a result, OneBeacon and Pennsylvania General were not obligated to defend Metro and have no obligation to indemnify Metro for the claims asserted in the underlying Counterclaim. Therefore, OneBeacon and Pennsylvania General respectfully request that the Court grant summary judgment in their favor and against the Defendant.

C.   **Exclusion n "Recall Of Products, Work Or Impaired Property"**:

Under Exclusion n, the Policy excludes coverage for damages claimed for "any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of 'your product,' 'your work' or 'impaired property,' if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it."

The damages claimed in the Counterclaim arose as a result of the determination that was made that due to the incorporation of Metro's defective, deficient and/or inadequate product, the pilings needed to be removed and reconstructed. Counterclaim (Exhibit B), ¶¶ 6-8. Consequently, such damages are excluded from coverage under Exclusion n, as they are the result of the withdrawal, repair, replacement, removal and/or disposal of Metro's product or work due to the suspected defect, deficiency and/or inadequacy of the grout.

In its Opposition, Metro reads this exclusion too narrowly and cites <u>United States Fidelity & Guaranty Company v. Wilkin Insulation Company</u>, 578 N.E.2d 926, 934 (1991), for the proposition that this exclusion only applies to "sister" products that are recalled from the market, and not to product that has already failed while in use. However, that is not what the Policy in this case actually states and that is not how Maryland courts have interpreted this exclusion.

The Policy in the instant case excludes from coverage not only damages related to a voluntary recall of product, work, or property by Metro, but also based upon a determination made by others that the insured's product, work or property should be removed or replaced because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it. That is precisely what happened in this case as it undisputed that after strength tests revealed that the pilings that incorporated Metro's product and/or work did not meet the required strength, the general contractor made the decision to remove and reconstruct the pilings.

In addition, in <u>Minnick's, Inc. v. Reliance Insurance Company</u>, 47 Md. App. 329,333 (1980), the Court held that a similar exclusion relieved Reliance of any liability or duty to defend for alleged property damages. The specific provision stated, in relevant part, that the insurance did not apply to "damages claimed for the **withdrawal,** inspection, **repair, replacement,** or loss of use of the named **insured's** products or work completed by or for the named **insured** or of any

property of which such products or work form a part, if such products, work or property are **withdrawn** from the market or from use because of any known or **suspected** defect or deficiency therein; . . ." *Id.* (Emphasis in original). The <u>Minnick's</u> decision is dispositive of Metro's contention that Exclusion n is merely a "sistership" exclusion because the <u>Minnick's</u> decision involved claims related to the repair and/or replacement of the insured's defective heating systems and the costs of using alternative heating systems while the defective systems were inoperable, i.e. product that has failed in use. *Id.* at 330.

Consequently, notwithstanding Metro's contentions to the contrary, exclusion n of the Policy excludes from coverage not only "sister" products that are recalled, but also damages related to a specific product that has failed. Therefore, the damages claimed by Berkel are excluded from coverage under Exclusion n as they are the result of the withdrawal, repair, replacement, removal and/or disposal of Metro's product or work due to the suspected defect, deficiency and/or inadequacy of the grout.

As a result, OneBeacon and Pennsylvania General were not obligated to defend Metro and have no obligation to indemnify Metro for the claims asserted in the underlying Counterclaim. Therefore, OneBeacon and Pennsylvania General respectfully request that the Court grant summary judgment in their favor and against the Defendant.

D.      **Exclusions j(5) and j(6) "Damage To Property"**:

Under Exclusions j(5) and j(6) of the "Damage To Property" exclusions contained in the Policy, the insurance does not apply to "property damage" to:

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Thus, since the claim consists of damages incurred as the result of restoring, repairing or replacing property due to Metro's work, either by virtue of work performed by Metro and/or materials supplied by Metro, under these "Damage to Property" exclusions, such damages are not covered under the Policy. Notwithstanding this fact, in its Opposition, Metro claims that Exclusion j(5) is not applicable to this action as Metro claims that there is no damage to any real property and Metro claims that Exclusion j(6) is not applicable to this action because Metro alleges that none of the claimed damages arose as a result of restoration, repair or replacement because Metro's work was incorrectly performed on the property.

As to Metro's contentions that the instant claim does not involve alleged damage to real property, it is important to note that the claim arises from a construction project to build a parking garage. The term "real property" means "land, and generally whatever is erected or growing upon or affixed to land." Anne Arundel County v. City of Annapolis, 352 Md. 117,125 (1998)(quoting Black's Law Dictionary 847 (6th abr. ed. 1991)). Consequently, as the construction project involved erecting concrete pilings, pile caps and columns on land, the damages related to the demolition and removal of such pilings, pile caps and columns constitute damage to real property and Exclusion j(5) applies to the instant action.

In addition, as to Metro's contentions that none of the claimed damages arose as a result of restoration, repair or replacement because Metro's work was incorrectly performed on the property, Metro overlooks the fact that under the Policy definitions, "your work" includes "materials, parts or equipment furnished in connection with such work or operations." Consequently, even if Metro contends that it did not perform any work on the pilings, pile caps or columns, there is clearly no dispute that Metro's work, i.e. the materials that it furnished, were used on the project. Therefore, Exclusion j(6) applies to the instant action.

Thus, the damages incurred as the result of restoring, repairing or replacing property due to Metro's work, either by virtue of work performed by Metro and/or materials supplied by Metro, are not covered under the Policy. Consequently, OneBeacon and Pennsylvania General were not obligated to defend Metro and have no obligation to indemnify Metro for the claims asserted in the underlying Counterclaim. Therefore, OneBeacon and Pennsylvania General respectfully request that the Court grant summary judgment in their favor and against the Defendant.

E.       **Exclusion l "Damage To Your Work"**:

Under Exclusion l, the insurance does not apply to "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard." Exhibit A (the Policy), Section I.2., Exclusion l. Thus, under these "Damage to Your Work" exclusions, as the damages requested in the Counterclaim were incurred as a result of the grout supplied by Metro or any other work performed by Metro, which was completed by Metro, these damages are not covered under the Policy.

In its Opposition, Metro claims that it "has made no claim that OneBeacon is required to indemnify Metro for damage to its grout." Metro's Opposition, p. 23. However, as set forth above, under the Policy definitions, "your work" includes "materials, parts or equipment furnished in connection with such work or operations" and there is clearly no dispute that Metro's work, i.e. the materials that it furnished, were used on the project. Consequently, the damages in the Counterclaim that were incurred as a result of the grout supplied by Metro or any other work performed by Metro, are not covered under the Policy.

In addition, as set forth above in Section III.A., due to the settlement agreement entered into by Metro, the implications of which are discussed below in Section IV, *infra*, because of

Metro's defective work and/or product, Metro agreed to issue a "credit memorandum in the full amount of all of Metro's invoices to Berkel that are unpaid as of the date of this settlement" and the parties agreed to dismiss all claims with prejudice. *See* Amended Complaint ¶ 60; *see also* Settlement Agreement and General Release, attached to the Amended Complaint as Exhibit C. Metro is now seeking payment from the Plaintiffs herein for these very costs.  Consequently, contrary to Metro's contentions, Metro is in fact making a claim under its CGL policy for its unpaid invoices arising out of its defective work.

Therefore, there is no coverage under Exclusion l of the Policy. As a result, OneBeacon and Pennsylvania General were not obligated to defend Metro and have no obligation to indemnify Metro for the claims asserted in the underlying Counterclaim. Therefore, OneBeacon and Pennsylvania General respectfully request that the Court grant summary judgment in their favor and against the Defendant.

F.        **"Contractual liability" Exclusion**:

Under the "Contractual Liability" exclusion of the Policy, the insurance does not apply to "'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement . . ." Amended Complaint ¶ 49; Exhibit A (the Policy), Section I.2., Exclusion b.  In Count III (Indemnity) of the Counterclaim, Berkel alleged that "[a]s a direct result of the Contract between Metro and Berkel, and the convenants provided by Metro therein, Metro is expressly obligated to indemnify Berkel for all costs incurred as a result of having supplied defective and non-conforming grout product." Amended Complaint ¶ 50; Counterclaim (Exhibit B), ¶ 22.

In light of this fact, OneBeacon and Pennsylvania General contend that to the extent that Metro had contractually assumed liability as alleged by Berkel for the damages claimed by

Berkel, such damage as a result of the contractual assumption of liability is excluded from coverage under the "Contractual Liability" exclusion contained in the Policy. Metro contends that this exclusion does not apply because it alleges that the contract with Berkel was an "insured contract" and that it was liable to Berkel in the absence of the assumption of contractual liability. *See* Metro's Opposition, p. 24.

However, Metro overlooks the fact that in order to be an "insured contract," under the Policy definitions, the liability assumed has to be the "tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization." However, the liability for which Berkel was claiming damages in the Counterclaim were the costs that it incurred by virtue of its "indemnity and other contractual obligations" with the general contractor. *See* Counterclaim, ¶ 10 (Exhibit B to Amended Complaint). Consequently, this liability assumed by Metro was not Berkel's tort liability and such liability would not have existed in the absence of the assumption of liability by Metro. Therefore, the "contractual liability" exclusion in the Policy applies and there is no coverage for such assumed liability.

As a result, OneBeacon and Pennsylvania General were not obligated to defend Metro and have no obligation to indemnify Metro for the claims asserted in the underlying Counterclaim. Therefore, OneBeacon and Pennsylvania General respectfully request that the Court grant summary judgment in their favor and against the Defendant.

IV.     **OneBeacon And Pennsylvania General Were Not Obligated To Defend Metro And Have No Obligation To Indemnify Metro For The Claims Asserted In The Underlying Counterclaim Since Metro Is Not Legally Obligated To Pay Any Damages Because Of Bodily Injury Or Property Damage.**

Under the provisions of the Policy, OneBeacon and Pennsylvania General are only required to pay "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Exhibit A (the

Policy), Section I.1.a.  For the reasons set forth herein *supra*, and in the Plaintiffs' Memorandum of Law in support of their Motion for Summary Judgment, there was no "bodily injury" and no "property damage" to which the insurance applies. However, even in the event that the Court finds that there was "bodily injury" or "property damage," Metro was nevertheless not legally obligated to pay any <u>damages</u>.

Pursuant to the terms of a Settlement Agreement and General Release (hereinafter "Settlement Agreement") between Metro and Berkel, Metro agreed to issue a "credit memorandum in the full amount of all of Metro's invoices to Berkel that are unpaid as of the date of this settlement" and the parties agreed to dismiss all claims with prejudice. *See* Amended Complaint ¶ 60; Exhibit C. Accordingly, the Settlement Agreement resulted in no payment being made by Metro to Berkel. In its Opposition, Metro contends that "the net result of the Settlement Agreement was that Metro liquidated its liability for property damages that it was legally obligated to pay Berkel." Metro's Opposition, p. 26. However, this is clearly incorrect.

Metro has admitted, both in the Settlement Agreement and in its Opposition, that it provided defective product to Berkel. *See* Amended Complaint ¶ 61; Exhibit C; Metro's Opposition, p. 26. Consequently, as the product that Metro supplied was not in conformity with the specifications under its contract with Berkel, Metro did not have a valid claim to collect the outstanding invoices from Berkel for the defective product that it supplied to Berkel. Stated another way, Metro's invoices were worthless.

Therefore, when Metro entered into the Settlement Agreement with Berkel and issued a "credit memorandum in the full amount of all of Metro's invoices to Berkel that are unpaid as of the date of this settlement," all that it did was issue a credit to Berkel for worthless invoices. Consequently, Metro is not out of pocket any money because it could have never collected the

outstanding invoices for the defective product supplied to Berkel.  Moreover, the very nature and amount of Metro's instant claim belies its argument that it suffered "damages." The amount Metro "lost" was not an amount asserted by Berkel incurred by third-parties due to damages caused by Metro's product.  Rather, the amount claimed by Metro was the amount of <u>its</u> invoices for its work that Berkel refused to pay because of Metro's insufficient grout.   These are not "damages" as contemplated by a CGL policy.   Rather, this is the insured's out-of-pocket loss for its failure to perform under its contract.

In addition, by the terms of the "walk away" Settlement Agreement, Metro was clearly not "legally obligated to pay" any "damages." As stated by the Court in <u>Bausch & Lomb Inc. v. Utica Mut. Ins. Co</u>., 330 Md. 758, 781 (1993), "damages" consist of "anything that a third party <u>can make you pay</u> for because of damage to that third party's property." (Emphasis supplied). In the context of insurance policies, the Court held that an ordinary policy holder would understand "damages" as meaning "money paid to make good an insured loss." <i>Id</i>. at 782. However, the issuance of a "credit memorandum" is not "money paid to make good an insured loss." In addition, there was in fact no payment made by Metro to Berkel and therefore no "damages."

Therefore, Metro is not legally obligated to pay any damages because of bodily injury or property damage to which the Policy applies. Consequently, OneBeacon and Pennsylvania General were not obligated to defend Metro and have no obligation to indemnify Metro for the claims asserted in the underlying Counterclaim. Therefore, OneBeacon and Pennsylvania General respectfully request that the Court grant summary judgment in their favor and against the Defendant.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiffs OneBeacon Insurance Company and Pennsylvania General Insurance Company respectfully request that the Court grant summary judgment in their favor and against the Defendant with respect to each Count contained in the Amended Complaint in this action.

Respectfully submitted,

_____/s_____
Stacey A. Moffet (Fed. Bar No. 23025)
Larry L. Puckett (Fed. Bar No. 26343)
Eccleston & Wolf, P.C.
729 E. Pratt Street, 7th Floor
Baltimore, Maryland 21202
(410) 752-7474
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 20, 2006, a copy of the foregoing Plaintiffs' Reply to Defendant's Opposition to Motion for Summary Judgment was sent via first class mail, postage prepaid, to:

Brian S. Jablon, Esquire
Saltzman & Jablon, LLC
3201 Rogers Avenue, Suite 301
Ellicott City, Maryland 21043
*Attorney for Defendant*

_____/s/_____
Larry L. Puckett